**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────

MARC G.,

                                        Plaintiff,

            v.

COMMISSIONER OF SOCIAL SECURITY,                   No. 3:20-CV-1032
                                                   (CFH)

                                        Defendant.

─────────────────────────────

**APPEARANCES:**                        **OF COUNSEL:**

Lachman, Gorton Law Firm                PETER A. GORTON, ESQ.
P.O. Box 89
1500 East Main Street
Endicott, New York 13761
Attorneys for plaintiff

Social Security Administration          LUIS PERE, ESQ.
J.F.K. Federal Building,
15 New Sudbury Street, Rm. 625
Boston, Massachusetts 02203
Attorneys for defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**MEMORANDUM-DECISION AND ORDER[1]**

Marc G.[2] ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking

review of a decision by the Commissioner of Social Security ("the Commissioner")

─────────────────

[1] Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 72.2(b), and General Order 18.  See Dkt. No. 8.
[2] In accordance with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in 2018 to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify plaintiff's last name by initial only.

denying his application for disability insurance benefits.  <u>See</u> Dkt. No. 1 ("Compl.").

Plaintiff moves for reversal and remand for the determination of benefits.  <u>See</u> Dkt. No.

14.  The Commissioner cross moves for judgment on the pleadings.  <u>See</u> Dkt. No. 21.

Plaintiff replies.  <u>See</u> Dkt. No. 22.  For the following reasons, plaintiff's motion for

judgment on the pleadings is granted, the Commissioner's cross-motion for judgment on

the pleadings is denied, and the Commissioner's determination is reversed and

remanded for further proceedings.

## I. Background

On February 9, 2018, plaintiff filed a Title II application for disability insurance

benefits.  <u>See</u> T. at 15, 188-96.[3]  Plaintiff alleged a disability onset date of July 14, 2017.

<u>See</u> <u>id.</u> at 54.  The Social Security Administration ("SSA") denied plaintiff's claim on

April 17, 2018.  <u>See</u> <u>id.</u> at 102.  Plaintiff requested a hearing, <u>see</u> <u>id.</u> at 113, and a

hearing was held on August 21, 2019, before Administrative Law Judge ("ALJ") Charlie

M. Johnson.  <u>See</u> <u>id.</u> at 47-86.  On September 5, 2019, the ALJ issued an unfavorable

decision.  <u>See</u> <u>id.</u> at 15-28.  On July 6, 2020, the Appeals Council denied plaintiff's

request for review.  <u>See</u> <u>id.</u> at 1-5.  Plaintiff commenced this action on September 3,

2020.  <u>See</u> Compl.

---

[3] "T." followed by a number refers to the pages of the administrative transcript the Commissioner filed.
<u>See</u> Dkt. No. 13.  Citations to the administrative transcript refer to the pagination in the bottom, right-hand
corner of the page, not the pagination generated by CM/ECF.

## II. Legal Standards

### A. Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1388(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied or it was not supported by substantial evidence.  See Johnson v. Bowen, 817 F.2d 983, 985-86 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).  The substantial evidence standard is "a very deferential standard of review . . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would have to conclude otherwise."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (internal quotations marks, citation, and emphasis omitted).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion is arguably supported by substantial evidence. See Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson, 817 F.2d at 986.  However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's

3

independent analysis of the evidence may differ from the [Commissioner's]." <u>Rosado v. Sullivan</u>, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

### B. Determination of Disability

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1)(E).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" <u>Id.</u> § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  <u>See id.</u> § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  <u>Id.</u> § 423(d)(3).  Additionally, the severity of the impairment is "based on objective medical facts, diagnoses[,] or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  <u>Ventura v. Barnhart</u>, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which

4

significantly limits his [or her] physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  See DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. (citing Berry, 675 F.2d at 467).

### III. The ALJ's Decision

Applying the five-step disability sequential evaluation, the ALJ first determined that plaintiff had not engaged in substantial gainful activity since July 14, 2017, the

5

alleged onset date.  See T. at 17.  At step two, the ALJ found that plaintiff had the following severe impairments: "migraines and fibromyalgia[.]"  Id.  At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See id. at 21.  Before reaching step four, the ALJ concluded that plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) except "he can only occasionally balance, kneel, stoop, crouch, crawl, or climb.  He must avoid concentrated exposure to extreme heat and extreme cold, noise, respiratory irritants, and hazards such as machinery and heights."  Id. at 22.  At step four, the ALJ determined that plaintiff was capable of performing relevant past work.  See id. at 26.  At step five, considering plaintiff's age, education, work experience, and RFC, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that plaintiff could perform.  See id. at 27-28.  Thus, the ALJ determined that plaintiff had "not been under a disability, as defined in the Social Security Act, from July 14, 2017, through the date of this decision[.]"  Id. at 28.

## IV. Arguments[4]

Plaintiff argues that the ALJ erred at steps two, three, four, and five of his decision by failing to consider (1) somatic symptom disorder and (2) the severity of plaintiff's anxiety and depression.  See Dkt. No. 14 at 15-20.  Plaintiff also contends that

---

[4] The Court's citations to the parties' briefs refer to the pagination generated by CM/ECF in the pages' headers.

the ALJ failed to properly "assess limitations to time off task and/or absenteeism[.]"  Id.

at 23.  The Commissioner argues that the ALJ's RFC decision is supported by

substantial evidence because he "considered all of the relevant opinions and treatment

records, and made independent findings of fact."  Dkt. No. 21 at 14.

# V. Discussion

## A. ALJ's Step-Two Determination

The ALJ determined that plaintiff had two severe impairments, migraines and

fibromyalgia.  See T. at 17.  As to plaintiff's physical impairments, the ALJ explicitly

discussed the evidence related to plaintiff's arthritis, sleep apnea, ringing in his ears and

head, and asthma, and found each to be non-severe.  See id. at 17-18.  The ALJ

concluded that plaintiff's "medically determinable mental impairments of depression and

anxiety do not cause more than minimal limitation in [his] ability to perform basic mental

work activities and are therefore non-severe."  Id. at 18.  The ALJ explained that he

"considered the four broad functional areas set out in the disability regulations for

evaluating disorders and in section 12.00C of the Listing of Impairments[.] . . .  These

four broad functional areas are known as the 'paragraph B' criteria."  Id. at 19.

In finding plaintiff's depression and anxiety to be non-severe, the ALJ noted that

"[t]he record shows the claimant has taken medication for anxiety and depression, but

he did not start counseling until January 2018."  T. at 18.  The ALJ also recounted

plaintiff's subjective reports of "confusion and memory problems, but after starting

therapy he reported feeling better than he had in a long time . . . [and] [h]e reported that

Cymbalta made a significant improvement in his symptoms[.]" Id. (citing T. at 313, 667, 671).  The ALJ stated that "[d]uring his neurological evaluation, the claimant exhibited a cooperative attitude and intact memory[,]" and during his consultative examination, he appeared anxious "but he was cooperative with normal behavioral presentation[, [h]e exhibited no psychotic symptoms[,] and [had] intact memory, attention, and concentration[.]" Id. at 18-19, 341, 360-61.  The ALJ indicated that plaintiff had "missed some doses of medications but had several good weeks toward the end of 2018 . . . [and] continued therapy into 2019 and by April, he 'seem[ed] t be getting better[.]'" Id. at 19 (quoting T. at 601).  Moreover, "[h]is recent reports show that he was feeling better overall and able to participate in more activities[.]" Id. (citing T. at 695).

As to plaintiff's activities of daily living, the ALJ explained that plaintiff "was planning projects around his home, [] he reported doing well in therapy[, and h]e had visitors stay at his home[.]" T. at 19 (citing T. at 674, 677, 680-82).  The ALJ also noted that "[t]hroughout the pendency of his claim, he has been able to create very detailed, meticulous records and documents, including charts and graphs with percentages and other information regarding his conditions, which also demonstrates intact cognitive function[.]" Id. (citing T. at 466, 545, 563).  Further, "[i]n his Activities of Daily living Report, he indicated he could go shopping and leave his home by himself, cook, care for his personal needs and for pets, handle his finances, follow instructions, and get along with others." Id. at 19, 228-31.

The ALJ determined that plaintiff had a mild limitation in each of the four functional areas.  See T. at 19-20.  First, the ALJ explained that plaintiff had a mild limitation in understanding, remembering, and applying information.  See id. at 19.  The

ALJ noted that plaintiff "reported having difficulty with his memory and confusion[,]" and plaintiff's therapist "Guy Windingland, LCSW, noted the claimant had memory problems and was easily confused[.]" Id. (citing T. at 196, 659-62). However, the ALJ found that plaintiff did not have more than a mild limitation because he "exhibited intact memory during his consultative examination . . . and during his neurological evaluation [.]" Id. (citing T. at 341, 360-61). The ALJ also relied on plaintiff's ability to "keep meticulous notes and create charts and graphs describing his activities throughout the record"; "recall most things in detail throughout the hearing"; and "handle his finances and follow instructions[.]" Id. (citing T. at 231, 273-76, 391, 494, 545).

Second, the ALJ determined that plaintiff had a mild limitation in his ability to interact with others. See T. at 19. The ALJ recounted plaintiff's reports that "he had rare social interactions and difficulty with others" but "could go shopping, leave his home by himself, and get along with others[.]" Id. at 19, 230-31, 361. In finding a mild limitation, the ALJ also considered plaintiff's cooperative behavior during his consultative examination and initial neurological evaluation, as well as his "having visits from friends and family[.]" Id. at 19 (citing T. at 341, 360, 680).

Third, the ALJ determined that plaintiff had a mild limitation in concentrating, persisting, or maintaining pace. See T. at 19. The ALJ recited plaintiff's reports of "brain fog" and "difficulty with his concentration." Id. "However, he also reported that he could follow instructions, handle his finances, and go shopping. He exhibited intact attention and concentration during his consultative examination . . . [and h]e has been able to keep meticulous, detailed record for himself and his doctors[.]" Id. (citing T. at 226-45, 273-76, 360, 494, 671).

Fourth, the ALJ determined that plaintiff had a mild limitation in adapting or managing himself because although he "reported having problems completing household chores, [] he has been able to care for his personal needs and care for his pets." T. at 20. The ALJ also noted that plaintiff "can handle his finances and follow instructions, [] he can leave his home by himself . . . [and] he has not been psychiatrically hospitalized and not needed emergency intervention for his mental health conditions." Id. (citing T. at 226-45).

## B. ALJ's Consideration of Mental Health Opinions

### 1. Treating Therapist Guy Windingland, LCSW

In 2018, Mr. Windingland considered the following diagnoses in providing an opinion on plaintiff's mental limitations: "[m]ajor depressive disorder, severe recurrent with anxious distress. Symptoms include, but are not limited to, fatigue, very poor concentration, memory impairment, social withdrawal, severe mental fogginess, [difficulty with decision] making, chronic insomnia, loss of interest [and] ability to enjoy activities, episodic anxiety [and] panic symptoms[.]" T. at 357. Mr. Windingland determined that plaintiff had extreme limitations in maintaining attention and concentration, performing activities within a schedule, completing a normal workday or work week without interruptions, and responding appropriately to ordinary stressors. See id. at 356. Mr. Windingland also concluded that plaintiff had a marked limitation in his ability to interact appropriately with the general public; and medium limitation in his abilities to accept instructions, respond appropriately to supervisors, and get along with co-workers. See id. As a result, Mr. Windingland determined that plaintiff would be off

task for more than thirty-three percent of a workday and would miss three or more days of work per month.  See id. at 357.

In 2019, Mr. Windingland completed a second medical source statement wherein he opined that plaintiff would have identical extreme limitations but would also be extremely limited in his ability to accept instructions and respond appropriately to supervisors, and markedly limited in his ability to interact with the public and get along with co-workers.  See T. at 657.  Mr. Windingland did not list plaintiff's diagnoses or symptoms but instead wrote, "see other report[.]"  Id. at 658.  In an addendum to the 2019 medical questionnaire, Mr. Windingland explained that plaintiff's diagnoses were "major depressive disorder, severe, chronic, [] anxious distress[.]"  Id. at 659.  He listed identical symptoms as in his 2018 opinion.  See id.  He also noted that plaintiff's conditions were "expected to be prolonged/long-term, due to existence of multiple chronic medical conditions."  Id.  Mr. Windingland noted that plaintiff's mood was "variable" and his affect varied based on his "physical/medical status."  Id.  He also stated that plaintiff was easily overwhelmed and confused, had difficulty with his memory, diminished capacity that worsened under stress, and "very confused states[.]"  See id.  Finally, Mr. Windingland noted that plaintiff had "many physical limitations as well as mental ones, [and] each fluctuate greatly on a day-to-day, even hour-to-hour basis, [and] affect each other profoundly."  Id. at 661.

The ALJ found Mr. Windingland's opinions to be "only partially persuasive" because although he "had the opportunity to personally observe and evaluate" plaintiff "over time" and his treatment notes documented "some deficiencies" in plaintiff's concentration and memory, "his treatment notes also show there are periods where

11

[plaintiff] was sleeping well and doing much better with improvement in mood."  T. at 20.
The ALJ also noted that Mr. Windingland's treatment notes "documented [that] there
were times [plaintiff] missed taking some doses of his medication[.]"  Id.  The ALJ found
Mr. Windingland's "observations" inconsistent with the consultative examiner's findings
of "intact memory, attention, and concentration, along with cooperative attitude[.]"  Id.
Finally, the ALJ discounted Mr. Windingland's opinion "regarding [plaintiff's]
concentration, persistence, or pace and interactions with others" because plaintiff
reported "that he is able to care for his personal needs, go shopping, leave his home by
himself, drive, handle his finances, and follow instructions[.]"  Id.

### 2. Disability Determination Services Consultant D. Brown, Psy.D.

Dr. Brown determined that because of plaintiff's migraines and depressive,
bipolar, and related disorders, plaintiff only had limitations in his ability to concentrate,
persist, or maintain pace.  See T. at 92.  Dr. Brown noted that plaintiff's mental health
disorder was severe.  See id.  The ALJ found this opinion to be unpersuasive because it
was inconsistent with Mr. Windingland's treatment notes indicating "some deficits in
memory and concentration[.]"  Id. at 21.  The ALJ also noted that "Dr. Brown did not
have the opportunity to personally evaluate" plaintiff or review "the entire record
available at the hearing, including the majority of Mr. Windingland's records[.]"  Id.

### 3. Consultative Examiner Sara Long, Ph.D.

Dr. Long conducted plaintiff's psychological consultative examination.  She found
that his thought processes were coherent; affect was appropriate with "[s]ome anxiety []
indicated with voice tremble during cognitive tasks"; and mood was "[s]omewhat
anxious."  T. at 360.  Plaintiff's recent and remote memory were intact.  See id. at 361.

As to his attention and concentration, "[h]e [wa]s able to do serial 7's.  He does report that he does have some difficulty at times with focus and distraction."  Id. at 360.  Dr. Long explained that plaintiff "report[ed] mild to, at times, moderate limitations due to distraction from the physical discomfort. . . .  There may be mild limitations with maintaining attention and concentration and maintaining a regular schedule.  There may be mild limitation regarding regulating emotions as he does indicate some anxiety secondary to the physical concerns."  Id. at 361-62.  Dr. Long diagnosed plaintiff with adjustment disorder with depression and anxiety, noted that the results of the examination "may interfere with his ability to function on a regular basis[,]" and that the expected duration of his mental impairments and his prognosis were "dependent on physical factors."  Id. at 362.

The ALJ determined that "[t]he opinion of consultative examiner Dr. Long is partially persuasive."  T. at 21.  The ALJ recounted Dr. Long's conclusions that plaintiff had no limitations in "working with simple or complex tasks, making decisions, and interactions with others; but "the claimant had mild or moderate limitation[s]" regulating his emotions "and with his focus and attention."  Id.  The ALJ relied on Dr. Long's "opportunity to personally evaluate" plaintiff and her familiarity "with the Social Security policies, regulations, and guidelines."  Id.  The ALJ found the opinion to be "generally consistent with [plaintiff's] ability to handle his finances, go shopping, and drive, as well as his ability to construct complicated, detailed charts and graphs throughout this record[.]"  Id.  However, the ALJ determined the opinion to be only partially persuasive because "her opinions are vague without specific vocational limitations."  Id.

#### 4. Christopher Yanusas, Ph.D.

Dr. Yanusas treated plaintiff for his traumatic brain injury in 2017 and 2018.  See T. at 35-38.[5]  He delivered two opinions, in May and August 2018.  See id. at 377, 385. In May 2018, he noted that plaintiff's "conditions" would cause pain and fatigue, and that the pain and fatigue would diminish his concentration and work pace, and require him to rest at work.  See id. at 376.  Dr. Yanusas also determined that plaintiff would be off task for more than thirty-three percent of a day and he would miss more than four days per month of work.  See id. at 376-77.  In his August 2018 medical source statement, he was "unable to answer" whether plaintiff's conditions would cause pain because he is "not a physician[.]"  Id. at 384.  In the May 2018 opinion, he concluded that plaintiff's conditions would cause fatigue, diminished concentration and work pace, and the need to rest.  See id.  Additionally, he predicted that plaintiff would be off task for thirty-three percent of the day and miss more than four days per month.  See id. at 384-85.

The ALJ found Dr. Yanusas' "opinion" to be unpersuasive.  See T. at 21.  The ALJ stated that "his opinion is internally contradicted, as he noted on the one hand that the claimant's conditions would cause pain and fatigue, but then later also noted that he could not comment on the claimant's pain and fatigue because he is 'not a physician[.]'" Id. (quoting T. at 376, 384).  The ALJ also noted that Dr. Yanusas did not provide explanations for his opinions "or the reason he thought the claimant would be absent from work so much[]" and "[h]e did not note the claimant's symptoms or his clinical findings."  Id.

---

[5] Plaintiff submitted Dr. Yanusas' treatment notes after the ALJ rendered his decision.  However, "new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).

## C. ALJ's Consideration of Physical Limitation Opinions

### 1. Disability Determination Services Consultant R. Abueg, M.D.

Dr. Abueg reviewed the record and determined that plaintiff could occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; walk, stand, and sit for six hours; and occasionally climb, balance, stoop, kneel, crouch, and crawl. See T. at 94-95. Dr. Abueg also concluded that plaintiff should avoid concentrated exposure to noise, hazards, fumes, odors, gases, poor ventilation, and extreme cold and heat. See id. at 95-96.

The ALJ found Dr. Abueg's opinion to be persuasive. See T. at 24. The ALJ determined that the opinion was "supported by the diagnostic imaging and testing in the record, showing normal age-appropriate changes in the claimant's brain and unremarkable nerve function in the claimant's lower extremities, but also adequately accounts for the claimant's subjective complaints of pain." Id. at 25. Further, the ALJ stated that Dr. Abueg's determination was supported by the physical consultative examination findings. See id. The ALJ also found the determination persuasive because of Dr. Abueg's familiarity with the Social Security Administration's policies, regulations, and guidelines. See id.

### 2. Consultative Examiner Gilbert Jenouri, M.D.

Dr. Jenouri conducted plaintiff's physical consultative examination. He noted that plaintiff had full strength and dexterity in his hands and fingers; full ranges of motion and strength in shoulders, elbows, wrists, and hands; normal gait; no spinal tenderness or trigger points; and full range of motion in his lower extremities. See T. at 365. Due to plaintiff's back pain, asthma, hypertension, history of a traumatic brain injury, and

15

complaints of foot numbness and tingling, Dr. Jenouri determined that plaintiff had mild to moderate restrictions walking and standing for long periods, bending, stair climbing, lifting, and carrying.  See id. at 366.  He also determined that plaintiff should avoid dust, smoke, and other respiratory irritants.  See id.

The ALJ found Dr. Jenouri's opinion to be partially persuasive because it was supported by his "observations of the claimant during his evaluation[.]"  T. at 25.  The ALJ also determined that the opinion was consistent with imaging of plaintiff's brain, "as well as the observations of neurosurgeon Khalid Sethi, M.D., that the claimant had full strength in his extremities and no overt signs requiring surgery[.]"  Id. (citing T. at 416, 538).  The ALJ also noted that Dr. Jenouri is familiar with the Social Security Administration policies but did not find the opinion more persuasive because it was "vague without specific vocational limitations."  Id.

### 3. Treating Neurologist Michael Meyer, M.D.

In April 2019, Dr. Meyer submitted a letter to excuse plaintiff from jury duty.  See T. at 617.  He wrote that plaintiff had "a number of neurological issues with wide range of debilitating symptoms, along with neck, back and lower lumbar pain which makes him unable to sit for long periods of time."  Id.  In August 2019, Dr. Meyer submitted a medical questionnaire and listed plaintiff's conditions as severe hypertension, "whole body pain syndrome[,]" headaches, history of depression, abnormal brain MRI, and fibromyalgia.  See id. at 654.  He stated that plaintiff "ha[d] been seen only 3 times by Neurology[.]"  Id. at 655.  Dr. Meyer noted that plaintiff's conditions would not cause pain, but would cause fatigue and a need to rest at work.  See id. at 654.  He stated that he was unable to evaluate whether plaintiff's conditions would cause him to be off task

but that he would miss two days of work per month.  See id. at 654-55.  When asked "[i]f sitting is impacted by patient's condition," to "indicate how many hours the patient can sit out of an 8 hour workday[,]" and "[i]f your patient should alternate between sitting/standing, please indicate how often that is needed[,]" Dr. Meyer wrote "no[.]"  Id. at 655.  He also wrote "n/a" for the question about sitting for an entire eight-hour workday.  Id.  As to how long plaintiff could stand or walk in an eight-hour day, Dr. Meyer wrote "(4 to 6?) Best answered by Rheumatology[.]"  Id.  Finally, as to plaintiff's ability to lift, Dr. Meyer wrote "patient not known to be doing manual labor with his employment[.]"  Id.

The ALJ found Dr. Meyer's medical source statement to be unpersuasive.  See T. at 25.  The ALJ identified an alleged "contradiction" where Dr. Meyer "noted that he was 'unable to assess' the claimant's [] abilities, but then went on to note he could not perform manual labor[.]"  Id.  The ALJ also took issue with Dr. Meyer's letter expressing that plaintiff could not sit for extended periods of time because "as a neurologist, it is unclear his qualifications as a basis for his opinions . . . as he is not an orthopedist."  Id.  Finally, the ALJ noted that Dr. Meyer's opinion that plaintiff's conditions would not cause pain was contradicted by his notation that plaintiff had 'whole body pain syndrome[.]'"  Id. (quoting T. at 654).

### 4. Primary Care Provider Lazarus Gehrig, M.D.

In Dr. Gehrig's 2018 medical questionnaire, he noted that plaintiff's conditions included "myalgia/disc disorder[,]" migraines, anxiety, sleep apnea, history of a traumatic brain injury, chronic fatigue, and "HTN[.]"  T. at 380.  Dr. Gehrig explained that plaintiff had a new prescription for his myalgia and disc disorder, his anxiety was

17

"stabilizing slowly[,]" and there was no change in his chronic fatigue.  Id.  He concluded that plaintiff's conditions would cause pain, fatigue, diminished concentration and work pace, and a need to rest.  See id.  He also determined that plaintiff would be off task for more than thirty-three percent of a workday and miss more than four days of work per month.  See id. at 380-81.  When asked whether plaintiff's conditions would produce good and bad days, Dr. Gehrig checked "no" and wrote, "not up to single full day[.]"  Id. at 380.  In June 2019, Dr. Gehrig submitted an addendum to his medical source statement where he noted that plaintiff had "slight improvement in anxiety, fatigue, myalgias."  Id. at 614.

The ALJ found Dr. Gehrig's opinion to be partially persuasive.  See T. at 25.  The ALJ explained that "[a]lthough [Dr. Gehrig] has had the opportunity to personally evaluate the claimant over time, the claimant has had full motor function and ability to ambulate independently throughout the record . . . [and h]is opinion is contradicted by the claimant's ability to handle his finances, go shopping, and drive, as well as his ability to construct complicated, detailed charts and graphs throughout his record[.]"  Id.

### 5. Treating Source Aspen D'Angelo, RPA-C

Mrs. D'Angelo explained that she had "see [plaintiff] only once – diagnosis at this time is fibromyalgia with complaints of widespread pain, diffuse tenderness on exam [-] otherwise no acute findings[.]"  T. at 650.  As a result, she marked in her medical source statement that plaintiff would experience pain, fatigue, diminished concentration and work pace, and need to rest during the day.  See id.  She also determined that plaintiff would be off task for fifteen- to twenty-percent of the day and miss one or fewer days per month.  See id. at 650-51.  Mrs. D'Angelo concluded that plaintiff could sit for eight

hours "with breaks[,]" would need to change positions every two hours, could stand and walk for four hours, could occasionally lift over ten pounds, and could frequently lift under ten pounds.  Id. at 651.

The ALJ found this opinion to be partially persuasive because it "was based on a single interaction with the claimant, wherein the examination showed diffuse tenderness but no other problems with movement or function[.]"  T. at 26.  "However, [her] opinions are generally supported by the claimant's ability to care for himself and his pets, cook several times a week, mow his lawn, drive, go shopping, and follow instructions[.]"  Id.


## VI. Analysis

### A. Medically-Determinable Impairment

The ALJ found plaintiff's migraines, fibromyalgia, depression, anxiety, osteoarthritic changes, sleep apnea, asthma, and ear pressure to be medically-determinable impairments.  See T. at 17-18.  Plaintiff argues that the ALJ erred in not considering somatic symptom disorder at any point in his decision.  See Dkt. No. 14 at 13-15.  The Commissioner argues that the record does not "collectively substantiate a medically determinable impairment of somatic disorder" because plaintiff relies primarily on the treatment notes and opinion of Dr. Gehrig, who treated plaintiff's physical impairments, and no mental health provider "assessed a somatic disorder."  Dkt. No. 21 at 8-9.

The ALJ is required to "consider all of [a plaintiff's] medically determinable impairments of which [he or she is] aware, including [the] medically determinable

impairments that are not 'severe[.]'"  20 C.F.R. § 404.1545(a)(2).  To qualify as a

medically-determinable impairment, it "must result from anatomical, physiological, or

psychological abnormalities that can be shown by medically acceptable clinical and

laboratory diagnostic techniques.  Therefore, a physical or mental impairment must be

established by objective medical evidence from an acceptable medical source."  20

C.F.R. § 404.1521.  An acceptable medical source is a licensed physician, psychologist,

optometrist, podiatrist, audiologist, advanced practice registered nurse, physician

assistant, or qualified speech-language pathologist.  20 C.F.R. § 404.1502(a).  "[An

ALJ] will not use [a plaintiff's] statement of symptoms, a diagnosis, or a medical opinion

to establish the existence of an impairment(s)."  20 C.F.R. § 404.1521.  "Furthermore,

the evidence must 'show the existence of a medical impairment(s) . . . which could

reasonably be expected to produce the pain or other symptoms alleged.'"  Isacc R. v.

Kijakazi, No. 3:20-CV-1172 (ATB), 2022 WL 306364, at *4 (N.D.N.Y. Feb. 2, 2022)

(quoting 20 C.F.R. §§ 404.1529(b), 416.929(b)).

Whether something is considered a medically-determinable impairment is

influential to the remainder of the decision because "only medical determinable

impairments can be considered severe or non-severe, [and] only limitations stemming

from severe and non-severe impairments are considered in formulating an RFC."

Talbot v. Colvin, No. 3:13-CV-1249 (GTS), 2015 WL 5512039, at *6 (N.D.N.Y. Sept. 15,

2015).  Therefore, although it is generally harmless error for an ALJ's failure to find an

impairment severe as long as he or she found "*some* severe impairments at Step 2, and

proceeds through subsequent sequential evaluation on the basis of *combined effects of*

*all*," a finding that conditions are not "medically-determinable abnormalities rising to the

level of impairments" may not be harmless error as it effects "subsequent evaluative steps[.]" Showers v. Colvin, No. 3:13-CV-1147 (GLS), 2015 WL 1383819, at *8 (N.D.N.Y. Mar. 25, 2015); see also Greif v. Kijakazi, No. 20-CV-3159 (EK), 2022 WL 280605, at *1 (E.D.N.Y. Jan. 31, 2022) (emphasis added) ("If the ALJ identifies a severe impairment, he or she must determine if it meets or equals one of the impairments listed in Appendix 1 of the regulations[.]").

The ALJ erred by failing to consider somatic symptom disorder to be a medically-determinable impairment.  The inquiry is whether there was enough objective medical evidence to indicate that it was an ongoing problem.  See Jeffrey G. v. Comm'r of Soc. Sec., No. 5:20-CV-1016 (ATB), 2021 WL 4844146, at *6 (N.D.N.Y. Oct. 18, 2021) (affirming the ALJ's decision to find that the plaintiff's carpal tunnel syndrome was not a medically-determinable impairment because the "longitudinal medical records . . . do not identify carpal tunnel syndrome in [the] plaintiff's medical history, nor assess the condition as a current diagnosis or ongoing problem."); see also 20 C.F.R. § 404.1521. Somatic symptom and related disorders

> are characterized by physical symptoms or deficits that are not intentionally produced or feigned, and that, following clinical investigation, cannot be fully explained by a general medical condition, another mental disorder, the direct effects of a substance, or a culturally sanctioned behavior or experience.  These disorders may also be characterized by a preoccupation with having or acquiring a serious medical condition that has not been identified or diagnosed.

> Symptoms and signs may include, but are not limited to, pain and other abnormalities of sensation, gastrointestinal symptoms, fatigue, a high level of anxiety about personal health status, abnormal motor movement, pseudoseizures, and pseudoneurological symptoms, such as blindness or deafness.

Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138, 2016 WL
5507752, at *53 (S.S.A. Sept. 26, 2016) (spacing added).

The record reflects that beginning in 2014, plaintiff's primary care provider, Dr.
Gehring, assessed him for hypertension, anxiety, and headaches. See T. at 288. Dr.
Gehrig prescribed medications for plaintiff's hypertension and headaches, but he was
"[d]oing well" without anxiety medications. See id. at 288, 291. In 2017, Dr. Gehrig
assessed plaintiff for myalgia and noted that the myalgias and headaches were
"[m]ainly related to stress." Id. at 297-98. Plaintiff began presenting with chronic daily
headaches for which Dr. Gehrig adjusted plaintiff's medications. See id. at 303. Later,
plaintiff presented with "full body aches, fatigue, and . . . a whistling in his head." Id. at
305. He was assessed for myalgia but Dr. Gehrig noted that it was "[m]ore like
fibromyalgia or chronic fatigue. That is what it sounds like." Id. at 306. Dr. Gehrig also
assessed plaintiff with "[a]djustment disorder with anxiety" and noted that "[a]t this point
it is debilitating and covering [his myalgia and headaches]. Last labs look normal." Id.
at 309. Plaintiff "claim[ed] to be exquisitely sensitive to weather. . . .  Initially I thought
that he had some sort of hurricane phobia but he says it's really the pressure symptoms
that makes his muscles ache. . . .  I really don't think this is related to an old traumatic
brain injury he had before he was a patient of mine." Id. at 313. As to plaintiff's
myalgia, Dr. Gehrig stated that "[a]s needed anti-inflammatories, increase hydration,
activity as tolerated. Seems to be more psychosomatic." Id. at 314. Plaintiff was also
seen by Christopher J. Yanusas, Ph.D., at the UHS Sleep Center. See id. at 35-38. Dr.
Yanusas assessed plaintiff for anxiety and chronic pain disorder after plaintiff "described

multiple somatic symptoms[.]"  Id. at 37.  Dr. Yanusas stated that pain management

"would be the more appropriate therapy."  Id.

Toward the end of 2017, plaintiff presented with spine pain for which Dr. Gehrig

ordered X-rays.  See T. at 316-17.  At the same time, Dr. Gehrig noted that plaintiff's

myalgia and headaches were "mainly related to stress.  Cymbalta has been helpful but

not all the way.  We'll x-ray."  Id. at 317.  In 2018, for plaintiff's myalgia, Dr. Gehrig noted

that plaintiff should "[c]ontinue counseling and psychological aspect of these[]" and that

his headaches were "[v]ery much related to mood."  Id. at 323.  Dr. Gehrig ordered and

MRI for plaintiff's lumbar radiculopathy which revealed "[m]ultilevel spondylosis and

degenerative disc disease as well as facet joint arthropathy with resultant stenosis[.]"

Id. at 335; 323.  Plaintiff continued to present with pain, particularly "[f]oot and ankle

joint pains and shin discomfort which may actually be neuropathic pain.  He relates it to

shin splints although he had not been doing any activity that would cause that."  Id. at

325.  Dr. Gehrig explained that as to his adjustment disorder with anxiety, "[a]t the end

of the work-up I think this is what we are going to be left with to some degree[,]" and that

his myalgia and headaches would improve with "improved mood" and decreased stress.

Id. at 327.

As the ALJ noted, plaintiff brought extensive medical notes to his follow-up

appointments and counseling sessions.  See T. at 19 (citing T. at 545); see, e.g., T. at

573-93.  However, the record the ALJ cites to support this contention also notes that as

to plaintiff's myalgia, "[m]eds don't make much of a difference.  Mainly related to stress

but does have some neurologic and orthopedic issues that we are still going through."

Id. at 546.  In August 2018, Dr. Gehrig noted that "[m]ost of [plaintiff's] physical issues I

think have been fettered out and are being dealt w/ but the main issue and that is severe anxiety and psycho somatization.  I think we're just starting to scratch the surface."  Id. at 548.  For his adjustment disorder, neurology requested Lyme disease testing, which Dr. Gehrig thought "[wa]s reasonable."  Id. at 558.  Dr. Gehrig urged plaintiff to comply with his medications for his adjustment disorder and noted that his myalgia is "[m]ore th[a]n likely related" to it.  Id. at 561.  In October 2018, Dr. Gehrig noted that plaintiff, "[a]lthough slowly he has gotten better in the last year, most of his issues now are what I believe mood related and myalgic [sic] type pains."  Id. at 594.  In 2019, in reciting plaintiff's history of present illnesses, he stated that plaintiff had "[h]ighly volatile adjustment disorder w/ somatic [symptoms] based on multiple issues as outlined in his own notes."  Id. at 441.  Dr. Gehrig also stated that he was "[u]nsure whether [plaintiff] will be able to work again.  He comes today w/ his report sheet, graphs, and the like.  Checking his BP 8 times per day usually."  Id. at 438.  The following month, Dr. Gehrig explained that plaintiff had "[c]ontinued situational and weather related mood swings and inability to function although it seems to be getting better . . . .  His 2nd neurological opinion of his MRI seems to be favorable towards nothing chronic or debilitating.  That is not unexpected."  Id. at 601.  In June 2019, Dr. Gehrig related plaintiff's myalgia to "[c]hronic, psychosomatic issues.  Also known somatic issues and I've seen in the last year, certainly an improvement and would like to continue this.  Continue specialty care.  I am under the impression that we're not going to find one thing we can fix and make better for him.  The question is where his slow improvement will end and if he can get back into the work place."  Id. at 611.

Plaintiff sought a second opinion from a neurologist at Neuro Me4dical Care Associates.  See T. at 319-20.  During his neurological evaluation, his mental and physical examinations were normal.  See id. at 340-41.  The neurologist noted that plaintiff "describe[d] an odd whistling noise 50% of the time which I have no explanation for.  We will obtain an MRI of the brain . . . .   An EEG will be checked as well. . . . Untreated sleep apnea may also play a role in his cognitive difficulties."  Id. at 341.  The neurologist also noted plaintiff's "[h]istory of myalgias and various areas of numbness and tingling.  Much of this may be related to fibromyalgia and also superimposed cervical and lumbar radiculopathies."  Id.  During his neurology follow-ups, plaintiff had normal examinations and his EEG was unremarkable.  See id. at 388, 390-94.  Plaintiff "d[id] not have areas consistent with fibromyalgia; however, he d[id] have some tenderness in the cervical and lumbar spine."  Id. at 390.  Plaintiff "appear[ed] to have a physiologic weakens of his lower extremities."  Id. at 392.  For his "foggy headedness and cognitive dysfunction[,]" the neurologist explained that it could be caused by his sleep apnea which "[h]e d[id] not wish to treat[.]"  Id. at 394.  As to his myalgia, the neurologist did "not have any other neurologic explanation for this. . . .  His extensive laboratory work up has all been unremarkable.  A rheumatology consultation will be obtained . . . to rule out any possibility of fibromyalgia."  Id. at 394.  He was also referred to a pain management specialist.  See id. at 399.

In March 2018, plaintiff's pain management provider Khali Sethi, M.D., noted that "there is no role for surgical intervention.  He is following with neurology which I think is appropriate."  T. at 419.  In April 2019, Dr. Sethi again noted that "there is no role for surgical intervention at this point."  Id. at 416.  After seeing another neurologist, Michael

Meyer, M.D., at Guthrie-Sayre Neurology, plaintiff was noted to have "a reasonably intact mental status.  But on further testing there were signs of mild cognitive impairment and memory alteration."  Id. at 423.  Dr. Meyer assessed plaintiff for hypertension and noted that, "this is the underlying cause of his concern or his headaches and mental status aberrations[.]"  Id. at 435.  During his rheumatology evaluation, Aspen D'Angelo, RPA-C, noted that there was "no evidence of a connective tissue disorder at this time.  [His] labs last year [] showed normal inflammatory markers [and] negative ANA and rheumatoid factor. . . .  I am not sure what I can offer the patient treatment wise.  He has tried and failed many lines of therapy . . . including physical therapy, numerous medications."  Id. at 473.  During another visit with pain management specialist, Maurice I. Oehlsen M.D., in June 2019, it was noted that plaintiff "[c]ertainly [] does have degenerative disc disease in his cervical and lumbar spine, as well as some face hypertrophy, but likely these are not the primary etiology of his pain syndrome."  Id. at 630.  As a result, plaintiff was assessed for "[p]ain disorder with psychological factors[.]"  Id.

In January 2018, Dr. Gehrig referred plaintiff to Guy Windingland, LCSW, for therapy.  See T. at 320.  As the ALJ recounted, there is a counseling session note that reveals that plaintiff had a "better [week] this past [week]" and his "Cymbalta ha[d] made a significant improvement."  Id. at 671.  However, this note also indicates that plaintiff's concentration was "[r]eally low.  Loses focus easily.  Abs[ent] minded, forgetful – pretty bad."  Id.  The ALJ also stated that plaintiff planned for projects around the home, however, the note from Mr. Windingland that the ALJ cites reads in full, "[t]hinking – plans for projects he wants to do, [] this helps him fall asleep."  Id. at 674.  Mr.

26

Windingland's notes also indicate that "Gabapentin persisted in causing physical [symptoms]" which caused plaintiff's depression to increase.  Id. at 680.  He felt as those things "seemed really 'stalled' at that point, so some hopeless[] feelings crept in [and] it took a few days for that to improve."  Id.  As a result, he was going to try CBD oil for mood and pain and it seemed to be working but later plaintiff "state[d] the CBD oil turned out to be counter-productive, much like his reaction to gabapentin" a couple of months prior.  Id. at 683; 681-82.  As the ALJ cited, in October 2018, Mr. Windingland noted that plaintiff was "able to do slightly [more] than he had been" and was doing well overall.  See id. at 19, 685.  However, the following month plaintiff had "4 days [especially] bad" with no mental acuity and bad inflammation.  Id. at 686.  Plaintiff was having "trouble" with his feet which exacerbated his leg and back pain.  Id. at 687.  In July 2019, Mr. Windingland noted that plaintiff received his fourth MRI results which had nothing notable; plaintiff's BP, the weather, and stress contributed "to the quality of any given day"; and he had been able to recover faster from "head events."  Id. at 694.  In his most recent counseling session, plaintiff was "[f]eeling slightly better overall, able to do (incrementally) [more] things/activities."  Id. at 695; 19.  This note also indicated that "[m]inor things [were] very capable of throwing off [his] 'delicate balance' mentally, physically[,]" and his blood pressure and confusion had increased.  Id. at 695.

The Commissioner argues that the ALJ did not err "in failing to assess a somatic disorder at step two" because "the relevant mental practitioners did not assess a somatic disorder, nor do their treatment notes suggest a somatic disorder as the root cause of [p]laintiff's physical or mental symptoms[.]"  Dkt. No. 21 at 9.  The Court agrees on the former point but disagrees as to the latter.  The ALJ seemingly ignored the

multiple references to correlations between plaintiff's physical symptoms and his mental disorders.  The record is flooded with notations from various providers and examiners indicating that plaintiff's physical symptoms were stress-induced or -enhanced.  <u>See</u> T. at 298, 305, 309, 317, 320, 327, 362, 442, 546, 549, 556, 595, 608, 671, 674, 679, 686, 693-95.  Even more clearly, Dr. Gehrig noted on several different occasions that plaintiff's symptoms "[s]eem[] to be more psychosomatic"; he should "[c]ontinue counseling and psychological aspect of these[]"; his myalgia has "[c]hronic, psychosomatic issues"; "[m]ost of [plaintiff's] physical issues I think have been fettered out and are being dealt w/ but the main issue and that is severe anxiety and psycho somatization"; and he had "[h]ighly volatile adjustment disorder w/ somatic [symptoms.]" <u>Id.</u> at 314, 323, 441, 558, 611.  Dr. Yanusas noted that plaintiff's description of his symptoms was "somatic[.]"  <u>Id.</u> at 37.  Pain management specialist Dr. Oehlsen, diagnosed plaintiff with a "[p]ain disorder with psychological factors[.]"  <u>Id.</u> at 630. Psychological consultative examiner Dr. Long noted that the duration of plaintiff's psychological impairments "relate[d] to physical factors" and his "[p]rognosis appears to be dependent on physical factors."  <u>Id.</u> at 362.  Plaintiff's therapist, Mr. Windingland, also stated that plaintiff had "[m]any physical limitations as well as mental ones, [and] each . . . affect each other profoundly."  <u>Id.</u> at 661.

The ALJ referenced none of the above.  Even absent an explicit reference to somatic symptom disorder or psychosomatic symptoms, the ALJ did not once note the overtly stated correlation between plaintiff's physical and mental limitations.  The ALJ repeatedly acknowledged the lack of objective findings related to plaintiff's physical limitations and used this to justify discounting plaintiff's subjective complaints of pain

and medical providers' pain-related conclusions.[6]  See T. at 22-26.  However, the ALJ ignored, in those same records, the notations correlating the lack of objective findings to plaintiff's mental health problems.

The Southern District of New York has remanded on a similar factual background.  See Vernon v. Saul, No. 19-CV-10520 (OTW), 2021 WL 1085387, at *11–12 (S.D.N.Y. Mar. 19, 2021), judgment entered, 2021 WL 1168624 (S.D.N.Y. Mar. 25, 2021).  There, a reviewing psychiatrist determined that the plaintiff met the "diagnostic criteria for Major Depressive Disorder, Other Specified Trauma and Stressor-Related Disorder, and Somatic Symptom Disorder."  Id. at *11.  Further, throughout the treatment notes of the plaintiff's primary care physician, the plaintiff had no swelling or limited ranges of motion and negative laboratory test results, but he complained of constant pain, fatigue, memory lapses, anxiety, and headaches.  See id. at *3.  The primary care physician stated that it was his "medical opinion that [the plaintiff]'s issues are primarily psychiatric and social. . . .  It is possible that his psychiatric symptoms exacerbate his physical ones."  Id. at *4.  The ALJ determined that the plaintiff's bipolar disorder and depressive disorder were severe impairments but did not consider somatic symptom or related disorders.  See id. at *14.  The court explained that "[b]ecause [the] ALJ [] discounted both [] opinions, which both suggested a psychosomatic link, there was no consideration of the connection between [the p]laintiff's mental status and

---

[6] In reviewing the records related to plaintiff's fibromyalgia and headaches, the ALJ relied on plaintiff's physical examinations showing a normal gait, no tender points or trigger points, and full strength in his extremities; normal neurological evaluation; "unremarkable" brain imaging; and ability to shop, cook, and care for his personal needs.  T. at 22-26.  As such, the ALJ found that "[t]he record is not entirely consistent with the claimant's allegations[]" and "[t]he objective record does not fully support the claimant's subjective allegations of disability."  Id. at 24.  During the ALJ's review of the objective evidence and in making these conclusions, he did not consider the impact of plaintiff's mental health.  See id. at 22-26.

physical status." Id. at *17.  The court further expounded that "[e]ven if, as the ALJ

contends, [the] medical opinions . . . are not supported by the record, the ALJ was

required to seek clarifications from . . . the specialists that examined [the p]laintiff and

reviewed his medical records, or to seek the opinion of a consulting medical expert; she

may not substitute her own medical opinion."  Id. at *18; cf. Wilma M.S. v. Comm'r of

Soc. Sec., No. 20-CV-6383 (LJV), 2022 WL 138537, at *3 (W.D.N.Y. Jan. 14, 2022)

(remanding where "the ALJ did not even consider fibromyalgia to be a medically

determinable impairment in the first place" or "even acknowledge those findings about

positive tender or trigger points . . ., let alone explain whether—and, if so, why—he

discounted them.").

        This Court has also remanded on similar grounds.  See Lori H. v. Berryhill, No.

3:18-CV-0472 (DEP), 2019 WL 1578195, at *4 (N.D.N.Y. Apr. 12, 2019).  There, the

ALJ "rejected the somatic symptom disorder at step two based on a lack of objective

evidence" despite the record revealing, what the Court called, "a classic case of

somatization[.]"  Id. at *4.  Record notations indicated that "most of the physical

manifestations appear to be from somatization"; there was "a need to rule out physical

issues"; "physical symptoms seem to be exacerbated by stress"; and "[the] plaintiff's

depression could be related to what is going on; in other words, it could be related to

her mental condition."  Id.  The Court found that the ALJ erred at multiple steps of the

disability determination "because there are no limitations set forth in the RFC that relate

to and address the somatic symptom disorder" which "also affects the hypothetical at

step five."  Id.  As for listing 12.07, for somatic symptom disorder, the Court explained

that "since the ALJ found that the B criteria were not met, but clearly [] did not take into

account the somatization and the somatic symptom disorder, . . . I am not definitively able to say that that's harmless error."  Id.

To be sure, in Lori H., the ALJ did not find that the plaintiff had any severe mental impairments.  2019 WL 1578195, at *2.  This Court has held in one case that there is no error in an ALJ's failure to evaluate somatic symptom disorder where the ALJ determined that the plaintiff had other severe mental impairments at step two.  See Borelli v. Comm'r of Soc. Sec., No. 3:14-CV-1402 (GTS/WBC), 2015 WL 13744413, at *10 (N.D.N.Y. Dec. 2, 2015), report and recommendation adopted, 2016 WL 229342 (N.D.N.Y. Jan. 19, 2016) (emphasis added) (explaining that there was a single indication in the record that the plaintiff "'likely' met the criteria for PTSD and somatization disorder" and that "her somatization disorder, in addition to her other mental impairments, would make her 'prognosis for gainful employment . . . very poor.'").

Here, no medical provider or examiner diagnosed plaintiff with somatic symptom disorder.  See Lori H., 2019 WL 1578195, at *4; see also 20 C.F.R. § 404.1521 (emphasis added) (explaining that to establish the existence of a medically-determinable impairment "[an ALJ] will not use [a plaintiff's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).").  However, as discussed below, the ALJ did not find any of plaintiff's diagnosed mental health impairments severe or subsequently consider their severity in the remainder of his analysis.  Cf. Borelli, 2015 WL 13744413, at *10.  As such, the ALJ's lack of explicit consideration of the records indicating the correlation between plaintiff's psychological and physical limitations is troublesome, and the Court finds that the ALJ's failure to

separately consider this potential psychosomatic link is error.  See Vernon, 2021 WL 1085387, at *17; Kohler v. Astrue, 546 F.3d 260, 269 (2d Cir. 2008) (remanding where the Court was unable to "discern whether the ALJ properly considered all evidence relevant to" the four functional areas).  The ALJ's decision is particularly concerning as he appears to have used portions of treatment notes and opinions which supported his conclusions—that plaintiff has severe migraines and fibromyalgia and only mild depression and anxiety—while ignoring the remainder of those same notes and opinions indicating that plaintiff's anxiety causes or exacerbates his headaches and myalgia and that there is seemingly no physical cause for his myalgia.  See Strange v. Comm'r of Soc. Sec., No. 6:13-CV-527 (GLS/ESH), 2014 WL 4637093, at *9 (N.D.N.Y. Sept. 16, 2014) ("A classic case of cherry-picking evidence occurs when administrative law judges credit information consistent with their findings while ignoring or discrediting inconsistent information *from the same sources* without providing plausible reasons.").  As such, remand is warranted for consideration of whether plaintiff has a medically-determinable impairment of somatic symptom disorder.

## B. Step Two and Four Determinations

Plaintiff argues that the ALJ erred at step two "in failing to find [plaintiff's] psychiatric symptoms []severe[7] and, even if found non-severe, for failing to include any related limitations in the RFC."  Dkt. No. 14 at 22.  The Commissioner argues that the ALJ did not err at step two of his analysis because he appropriately found plaintiff's depression and anxiety to be non-severe.  Dkt. No. 21 at 6-7.

---

[7] Plaintiff states that "the ALJ errs in failing to find the psychiatric symptoms non-severe[.]"  Dkt. No. 14 at 22.  Given the nature of plaintiff's argument, the Court assumes this is a typographical error.

Even excluding consideration of somatic symptom disorder, the ALJ erred in his RFC determination as it relates to plaintiff's mental limitations.  At step two of the disability analysis, the ALJ must determine whether the claimant has a severe impairment that significantly limits his or her physical or mental abilities to perform basic work activities.  See 20 C.F.R. § 404.1520(c).  Basic work activities include walking; standing; sitting; lifting; carrying; pushing; pulling; reaching; handling; seeing; hearing; speaking; understanding, remembering, and carrying out simple instructions; using judgment; and responding appropriately to supervisors, co-workers, and usual work situations.  See Taylor v. Astrue, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012); see also 20 C.F.R. § 404.1522(b)(1)-(5)).  "Although the Second Circuit has held that this step is limited to screen[ing] out de minimis claims, the mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment is not, by itself, sufficient to render a condition severe."  Id. (alterations in original) (citations and internal quotation marks omitted).  The failure to find an impairment severe is generally harmless "where the ALJ concludes (a) there is at least one other severe impairment, (b) the ALJ continues with the sequential evaluation, and (c) the ALJ provides explanation showing she adequately considered the evidence related to the impairment that is ultimately found non-severe."  Takeylyn G. v. Saul, No. 1:18-CV-292 (ATB), 2019 WL 3369266, at *4 (N.D.N.Y. July 26, 2019).

The ALJ found that plaintiff's anxiety and depression were not severe impairments because he had only mild limitations in all four of the relevant functional categories.  See T. at 19-20.  In making this determination, the ALJ heavily relied on plaintiff's consultative examination, his activities of daily living, and his ability to "keep

33

meticulous notes and create charts and graphs describing his activities[.]"  Id. at 19.

Plaintiff's therapist, Mr. Windingland, concluded that plaintiff had extreme or marked

limitations in every category.  See id. at 657.  However, the ALJ found this inconsistent

with Dr. Long's consultative examination findings of intact memory, attention, and

concentration, and with plaintiff's activities and abilities.  See id. at 20.  The Regulations

"recognize that the Commissioner's consultants are highly trained physicians with

expertise in evaluation of medical issues in disability claims whose opinions may

constitute substantial evidence in support of residual functional capacity findings."

Lewis v. Colvin, 122 F. Supp. 3d 1, 7 (N.D.N.Y. 2015) (quoting Delgrosso v. Colvin, No.

3:13-CV-1470 (GTS/ESH), 2015 WL 3915944, at *4 (N.D.N.Y. June 25, 2015))

(quotation marks omitted).  However, the ALJ's decision cannot be supported by

substantial evidence where he "cherry picked" or mischaracterized the record "because

reviewing courts cannot conclude, under such circumstances, that adverse findings

were based on evidence reasonable minds might accept as adequate to support a

conclusion."  Strange, 2014 WL 4637093, at *9.

As the ALJ explains, Dr. Long found that plaintiff had intact memory.  See T. at

19, 361.  However, the ALJ incorrectly stated that Dr. Long "noted the claimant had

intact [] attention, and concentration[.]"  Id. at 20.  Dr. Long stated that plaintiff was "able

to do serial 7s . . . [but] [h]e does report that he does have some difficulty at times with

focus and concentration."  Id. at 360.  Dr. Long therefore determined that "[t]here may

be some mild limitations with maintaining attention and concentration and maintaining a

regular schedule[.]"  Id. at 361.  As the ALJ explained, during plaintiff's physical

examinations, he was alert and oriented, and was attentive and able to concentrate.

See id. at 18-20, 327, 417, 457.  However, his mood varied between anxious, baseline, and normal.  See id. at 300, 309, 314, 317.  Mr. Windingland noted that "Cymbalta seems to help, though recently a [change] in manufacturers that Walmart caries has caused [plaintiff] to feel he's had – a 20% drop in affectiveness [sic]." Id. at 669.  One month later, he wrote that "Cymbalta has made a signif[icant] improvement." Id. at 671. However, in this same note, he stated that plaintiff's concentration was "re[a]lly low[,]" he would lose focus easily, and was forgetful.  Id.  Mr. Windingland indicated that plaintiff's symptoms vary widely depending on whether it is a good day or stressful day. See id. at 674, 685-86, 689.  In the most recent counseling note, Mr. Windingland stated that "minor things [were] very capable of throwing off" plaintiff's mental and physical health.  Id. at 695.  The ALJ cited to the portions of records showing cooperative behavior and positive reactions to Cymbalta but failed to acknowledge the records indicating his poor, variable mood, and lack of concentration.  See id. at 18-20.

Throughout the entire decision, and citing primarily to plaintiff's initial report submitted to the SSA, the ALJ heavily relied on plaintiff's activities of daily living, explaining that he can cook, shop, care of his personal needs, follow instructions, and handle his finances.  See id. at 18-25.  In the same report, plaintiff stated that "approx. 2/3 of day is resting"; he "used to shower every day and on average if every three days"; he shops "in short trips to get what [he] needs"; and he can handle his finances but he has "to do slowly with rests[,] can only do on days when mind is less cloudy and confused[,] do also make more errors[.]"  Id. at 227-231.  In filling out his disability paperwork, plaintiff twice called the SSA to inform them that it was taking him longer than expected because he could "only do [it] in short periods [and t]hen [would] lose the

ability to think for days[.]" Id. at 235, 223-24.  In reviewing plaintiff's physical limitations,

the ALJ recounted plaintiff's complaints that he has to frequently rest "and can only

perform tasks in short periods." Id. at 21-23.  It is the ALJ's duty to resolve conflicts in

the record, however, before reconciling any conflicts, it is not clear that the ALJ

considered the full extent of the evidence indicating more severe limitations.  Likewise, it

is unclear that the ALJ considered whether those limitations stemmed from plaintiff's

mental health—particularly considering that the ALJ did not once reference plaintiff's

mental health diagnoses or symptoms after step two.[8] See id. at 17-26; see also Lee G.

v. Comm'r of Soc. Sec., No. 5:19-CV-1558 (DJS), 2021 WL 22612, at *6 (N.D.N.Y. Jan.

4, 2021) (citation and quotation marks omitted) (explaining that "the presence of cherry-

picking is particularly troublesome where . . . mental health symptoms are involved

[because m]ental health patients have good days and bad days; they may respond to

different stressors that are not always active.").  This is noteworthy given Mr.

Windingland's counseling notes and his medical source statement indicating extreme

limitations in concentration and work pace and production, and the various other

opinions indicating diminished concentration and work pace.  See T. at 356, 376, 380,

384, 498, 615, 658, 671, 695.  As such, the Court cannot conclude that the ALJ properly

articulated his reasoning for finding that plaintiff had only mild limitations in all four

functional categories, and, in turn, that his anxiety and depression were not serve

impairments.

---

[8] After reciting the objective evidence and medical opinions related to plaintiff's headaches and
fibromyalgia, the ALJ explained that "[a]ll of this evidence was considered in the residual functional
capacity.  The exertional and postural limitations consider the claimant's alleged pain from his
fibromyalgia.  The environmental limitations, pulmonary restrictions, and restrictions from hazards further
consider the claimant's reports that his headaches are exacerbated by respiratory irritants and changes in
weather, as well as limitations on movement caused by the combination of his impairments."  T. at 24.

However, even if a plaintiff or the Court disagrees with the ALJ's assessment of the evidence and there is evidence in the record supporting a different conclusion, "whether there is substantial evidence supporting the [plaintiff's] view is not the question []; rather, [the Court] must decide whether substantial evidence supports the ALJ's decision." Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order) (emphasis omitted).  This is especially true at step two where an ALJ's failure to find an impairment severe is generally harmless error.  See Snyder v. Colvin, No. 5:13-CV-585 (GLS/ESH), 2014 WL 3107962, at *5 (N.D.N.Y. July 8, 2014) ("[W]hen functional effects of impairments erroneously determined to be non-severe at Step 2 are, nonetheless, fully considered and factored into subsequent residual functional capacity assessments, a reviewing court can confidently conclude that the same result would have been reached absent the error.").  The ALJ's step-two analysis cannot constitute harmless error because he concluded that plaintiff had "medically determinable mental impairments of depression and anxiety" and mild limitations in every functional category but did not include any mental health limitations in the hypothetical presented to the vocational expert ("VE") or in plaintiff's RFC.  T. at 18, 19-22, 77-78; see Monell v. Astrue, No. 8:08-CV-0821 (NAM), 2009 WL 4730226, at *6 (N.D.N.Y. Dec. 3, 2009) (remanding because "[n]otably, at step two the ALJ found [the p]laintiff had mild limitations in three areas of mental functioning . . . .  Thus, at step two the ALJ indicated that [the p]laintiff had at least some mental limitations, but at step four the ALJ failed to consider the relevant evidence or reach findings on [the p]laintiff's mental abilities."); Rousey v. Comm'r of Soc. Sec., 285 F. Supp. 3d 723, 740 (S.D.N.Y. 2018) (remanding because "the ALJ concluded that [the] plaintiff had a medically-

determinable impairment of an adjustment disorder with depressed mood and amnestic disorder NOS . . . .  However, the ALJ's RFC finding, which was the basis for the hypothetical to the vocational expert, did not include any mental limitations, and the ALJ does not offer any explanation for omitting those mental impairments from his RFC finding.").

The failure to include mental limitations in an RFC after finding that the plaintiff has such limitations can too be harmless "if (1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace[.]"  McIntyre v. Colvin, 758 F.3d 146, 152 (2d Cir. 2014) (citation and quotation marks omitted) (alterations in original).  Neither occurred in this case.  The ALJ's hypothetical to the VE limited plaintiff to "work at the light exertional level with the following restrictions[:] occasional postural, meaning balancing, kneeling, stopping, crouching, crawling or climbing and must avoid concentrated exposure to heat, extreme cold, noise, respiratory irritants, and hazards such as machinery and heights."  T. at 77-78.  Dr. Long determined "that there do not appear to be limitations regarding simple and complex tasks and making appropriate decisions."  Id. at 361.  However, Mr. Windingland concluded that plaintiff was extremely limited in his ability to respond appropriately to ordinary stressors and complete a normal workday without interruptions from his psychologically-based symptoms.  See id. at 356, 657.  The ALJ discounted Mr. Windingland's opinions, in part, because Dr. Long "noted the claimant had intact memory, attention, and concentration, along with

cooperative attitude." Id. at 20.  As discussed, this is not an entirely complete recitation of Dr. Long's findings.  Nevertheless, the ALJ's hypothetical did not limit plaintiff to unskilled work.  See Tana S. v. Berryhill, No. 1:17-CV-0414 (CFH), 2018 WL 4011560, at *7 (N.D.N.Y. Aug. 22, 2018) (affirming where "[a]s in McIntyre, the ALJ explicitly limited the hypothetical question posed to the VE to such simple, routine tasks after fully explaining [the p]laintiff's physical restrictions, and, therefore, sufficiently accounted for the combined effect of her impairments."); Domblewski v. Comm'r of Soc. Sec., No. 1:19-CV-686 (DB), 2020 WL 5800875, at *7 (W.D.N.Y. Sept. 28, 2020) (affirming where "the ALJ posed the hypothetical question to the VE . . . [and] included a limitation to 'simple tasks,' even though that limitation was not in the RFC assessment.")

The Court cannot conclude that the ALJ's hypothetical and RFC determination are supported by substantial evidence where he did not include, or explain the exclusion of, mental health or unskilled work limitations after finding that plaintiff was mildly limited in every mental health category.  See Snyder, 2014 WL 3107962, at *5 ("It is impossible . . . for a reviewing court to conclude that [the] ALJ [] would have come to the same residual functional capacity assessment . . . had she factored in [the plaintiff's] mental-impairment limitations of moderate difficulties in concentration, persistence, pace and social functioning.").  Remand is therefore warranted for further consideration of the severity of plaintiff's mental limitations and their impact on his RFC.  See Parker-Grose v. Astrue, 462 F. App'x 16, 18 (2d Cir. 2012) (summary order) (explaining that the ALJ found the plaintiff's "mental impairment [was] mild and only minimally affect her capacity to work," but "even if this Court concluded that substantial evidence supports the ALJ's finding that [the plaintiff's] mental impairment was nonsevere, it would still be necessary

to remand this case for further consideration because the ALJ failed to account [for her] mental limitations when determining her RFC.  A RFC determination must account for limitations imposed by both severe and nonsevere impairments.").

As remand is required, the Court need not reach plaintiff's remaining arguments concerning whether (1) plaintiff's symptoms meet Listing 12.07 for somatic symptom disorder; (2) the ALJ erred in his review of the medical opinions; and (3) the ALJ erred in excluding a time off task or absenteeism limitation.  See Dkt. No. 14; see also Devra B. B. v. Comm'r of Soc. Sec., No. 6:20-CV-00643 (BKS), 2021 WL 4168529, at *8 (N.D.N.Y. Sept. 14, 2021) ("Because the Court has determined that remand is required, the Court does not reach [the p]laintiff's remaining arguments.").  On remand the Commissioner is to consider plaintiff's mental health limitations at every stage of the disability determination and to assiduously apply the relevant requirements for reviewing medical opinions under 20 C.F.R. § 404.1520c(b) and (c).

## VII. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**ORDERED**, that plaintiff's Motion for Judgment on the Pleadings, Dkt. No. 14, is **GRANTED**; and it is further

**ORDERED**, that defendant's Cross-Motion for Judgment on the Pleadings, Dkt. No. 21, is **DENIED**, and the matter is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with this Memorandum-Decision & Order.

**IT IS SO ORDERED.**

Dated:  March 7, 2022
          Albany, New York

*Christian F. Hummel*

Christian F. Hummel
U.S. Magistrate Judge